**E. Bates NISBET, Plaintiff In Error,**

**v.**

**MIDWEST OIL CORPORATION, a corporation, Defendant In Error.**

**No. 42750.**

Supreme Court of Oklahoma.

July 23, 1968.

George & George, Ardmore, Jones & Jones, McAlester, for plaintiff in error.

Ames, Daugherty, Bynum, Black, Ashabranner & Rogers, Oklahoma City, Baumert & McCurtain, McAlester, for defendant in error.

LAVENDER, Justice.

This appeal involves a judgment in favor of the defendant-lessee and against the plaintiff-lessor in an action wherein the primary relief sought by the plaintiff was recission of an oil and gas lease for alleged fraud on the part of the defendant in obtaining the execution of the lease by the plaintiff.

For some time prior to July 20, 1959, the plaintiff had been, and on that date was, the owner of an undivided five-eighths interest in and to the East Half of the Southeast Quarter of Section 15, Township 6 North, Range 21 East, in Latimer County, State of Oklahoma, and in and to the minerals and mineral rights (except coal and the by-products thereof) therein and thereunder.

On or about July 15, 1959, the plaintiff, who resided in Houston, Texas, received a long-distance telephone call from Mr. John A. Croom of the defendant's land department in Fort Worth, Texas, about leasing her interest in this land to the defendant company, and on the same day, or the next day, a Houston lease broker who ad-

mittedly was authorized by the defendant corporation to obtain a lease from her called on the plaintiff at her home and talked about such a lease for a primary term of five years. He told her that the going bonus for leases in the area was from $25 to $40 per acre but that the company would pay $50 an acre, and she told him that others had offered her "production payments" of $5,000.00 to be paid out of a 1/32 overriding royalty. At her suggestion, he left with her a blank copy of of the printed form of lease proposed to be taken—a "Texas Producers 88-Pooling July 58" form, which is printed on both sides of one sheet of paper—for her to examine. He returned on July 20, 1959, with copies of the same printed form with the blank spaces filled out to show a date of July 20, 1959, the plaintiff as lessor, the defendant corporation as lessee, the above described property as the leased property, and a primary term of five years from date, and having a paragraph typed on a losenge attached at the bottom of the front page of the form which provided for a 1/32 overriding interest until lessor received $5,000. In addition lessor was to receive the usual 1/8 of oil or gas produced.

Paragraph 7 of the lease form provided, in pertinent part, that:

"7. * * * In case of cancellation or termination of this lease for any cause, Lessee shall have the right to retain under the terms hereof, around each oil or gas well producing, shut-in, being worked on or drilling hereunder, *the acreage allocable to each such well for maximum allowable under the rules and regulations of any regulatory body, or absent such rules and regulations,* 40 acres around each oil well and 320 acres around each drilling or gas well, to be designated by Lessee." (Emphasis supplied.)

And paragraph 11 of the lease form provided that:

"11. Lessee is granted the right and power at any time, and from time to time, to pool and combine the leased premises, or any portion thereof, with other land, lease or leases, for the purpose of forming one or more units for the development and production of oil or gas. This right may be exercised either before or after drilling operations have been commenced or production of oil or gas, or both, has been obtained on any land included in such unit. Units may include either oil or gas or may be limited to one or more subsurface strata. No unit need conform in size or area with another unit, and the formation of one unit shall not preclude the formation of others. Each unit shall comprise a single contiguous tract. No oil unit shall exceed forty (40) acres in surface area and no gas unit shall exceed three hundred twenty (320) acres in surface area, each plus a tolerance of ten (10%) percent thereof; *provided that, should governmental authority having jurisdiction prescribe or permit the formation of larger units for maximum allowable production, any unit created hereunder may conform substantially in size with those so prescribed or permitted.* Regardless of the actual location of drilling or production operations on a unit, the effect of the formation of such unit shall be that drilling operations on, or production of, oil or gas from such unit shall constitute and be considered as being performed on the leased premises under the terms hereof and the production of oil or gas from such unit shall be apportioned among the several tracts comprising the unit so that there shall be allocated to the tract in the unit which is covered by this lease such portion of the total production from the unit as the number of surface acres of the leased premises included in the unit bears to the total number of surface acres comprising the unit. The royalties and production payments, if any, payable hereunder on the production from such unit, shall be computed only on that portion of the production so allocated to the tract included in the unit which is covered by this lease and the rights and obligations of the parties hereto shall be

determined solely by this lease and not by a lease pooled herewith. * * *." (Emphasis supplied.)

Because of the plaintiff's objections to such provisions in the lease, the lease broker, using a ruler and pen, drew lines through the portions of paragraphs 7 and 11 of the lease form which are emphasized by italicizing above. The lines drawn through these provisions did not make them illegible.

Also, at the request of the plaintiff, the following paragraph, copied from another lease in the possession of the plaintiff, was typed onto the losenge attached at the bottom of the front page of the lease form, by the lease broker:

"It is expressly understood that this lease covers only oil, gas and its liquified products, and sulphur. Wherever the term 'other mineral or other minerals' appears in this lease it shall be construed as meaning 'the liquified products of gas, and sulphur.'"

The plaintiff signed the lease form as so revised, and the lease broker, as a notary public, took her acknowledgement. A draft drawn by him against the defendant corporation in favor of the plaintiff in the amount of $2,500.00 to cover the agreed bonus of $50.00 per acre was paid in due course.

Except with respect to the conversations between the plaintiff and Mr. Croom and between the plaintiff and the lease broker, mentioned above, the pertinent facts are, for the most part, either admitted by the pleadings or are covered by a written stipulation of the parties.

The delay rentals due the plaintiff, in accordance with the terms of the lease, on July 20, 1960, July 20, 1961, and July 20, 1962, were duly and timely paid by the defendant.

About May 5, 1959, drilling had been commenced on the defendant's "Raymond F. Orr Well #1" in the Southwest Quarter of Section 8, Township 6 North, Range 22 East, in Latimer County, less than four miles from the plaintiff's land involved herein (and the evidence discloses that she knew about such drilling operations at the time of the above mentioned negotiations), and on or about June 28, 1959, gas, in commercial quantities, was encountered in the Red Oak Sand Formation between the approximate depths of 7180 feet and 7355 feet. On November 30, 1959, the defendant filed with the Corporation Commission of the State of Oklahoma an application for the establishment of 640-acre spacing and drilling units for the production of natural gas from that sand underlying certain lands in Latimer County and LeFlore County, Oklahoma, including the plaintiff's tract involved herein and the tract on which the above mentioned well is located, and on March 16, 1960, after due notice and hearing, the Corporation Commission entered its order establishing 640-acre spacing with each governmental section as a drilling unit. This application was the first application for such an order, and this order was the first order made by the commission, with respect to this sand in this particular common source of supply.

In the meantime, the defendant had continued drilling of the above mentioned well, and on or about February 19, 1960, had encountered gas, in commercial quantities, in the Basal Atoka Spiro Sand Formation between the approximate depths of 11,509 feet and 11,580 feet. On March 16, 1960, the defendant filed with the Corporation Commission of the State of Oklahoma an application for the establishment of 640-acre spacing and drilling units for the production of natural gas from that sand underlying certain lands in Latimer and LeFlore counties, including the plaintiff's tract involved herein and the tract on which the above mentioned well is located, and on April 12, 1960, after due notice and hearing, the commission entered an order establishing 640-acre spacing with each governmental section as a drilling unit. This application was the first application for such an order, and this order was the first order made by the commission, with respect to this sand in this particular common source of supply.

Each of these orders of the Corporation Commission contained a provision:

"That all royalty interests within any spacing unit shall be communitized and each royalty owner within any unit shall participate in the royalty from the well drilled thereon in the relation that the acreage owned by him bears to the total acreage in the unit."

On or about November 26, 1962, the defendant commenced the drilling of its "Booth Unit Well #1" in the Northwest Quarter of the Southeast Quarter of Section 15, Township 6 North, Range 21 East, in Latimer County, and on or about March 1, 1963, that well was completed, to a depth of 12,228 feet, as a well capable of producing gas in commercial quantities from both of the above mentioned sand formations, but was shut in, on or about May 1, 1963, awaiting a market for the gas. On April 5, 1963, the defendant deposited $100.00 to the credit of the plaintiff in the depository bank named in the above mentioned oil and gas lease, as shut-in royalty for the period from May 1, 1963, to May 1, 1964.

On May 29, 1963, the defendant filed with the Corporation Commission of the State of Oklahoma an application for authority to dually complete its Booth Unit Well #1 for production of natural gas from both sand formations, and on June 20, 1963, after due notice and hearing, the commission entered an order granting that authority. That well was placed on production about December 13, 1963, and at the time of the trial herein, was still in production.

In the meantime, the defendant had tendered to the plaintiff division orders covering what the defendant contends is her royalty interest, but the plaintiff had declined to sign such division orders. Consequently, that portion of the royalty was being held in suspense.

On April 19, 1965, the plaintiff commenced this action against the defendant-lessee seeking, primarily, recission of the lease for alleged fraud in obtaining the execution thereof by the plaintiff, and in connection therewith, praying for an accounting for her share of the gas produced from the defendant's Booth Unit Well #1, with her share of the costs and expenses of drilling and operating the well to be deducted from her share of the production, on the basis that would be applicable if the lease had never existed. In the alternative, she prayed that she be decreed to be entitled to receive royalties of ⅛ of ⅝ of $^{80}\!/_{820}$ of the gas produced and marketed or used off the premises or used in the manufacture of gasoline or other products.

In her petition, the plaintiff alleges that, after reading the proposed lease form, she informed the defendant's agent that she would not sign the lease or any other lease covering her interest in this land whereby, or under the terms of which, an oil unit including her land would ever or under any circumstances exceed 40 acres in surface area or any gas unit including her land would ever or under any circumstances exceed 320 acres in surface area; that as a result thereof, the defendant's agent struck from paragraphs 7 and 11 the portions thereof which are emphasized above, and in addition thereto verbally represented, stated, contracted and agreed to and with the plaintiff, upon behalf of the defendant, that the defendant would never drill or participate in the drilling of a well for the production of oil on a unit in excess of 40 acres which included any part of the plaintiff's land, and would never drill or participate in the drilling of a well for the production of gas on a unit in excess of 320 acres which included any part of her land; that these deletions, representations and agreements were intended by the defendant to induce the plaintiff to execute the lease as revised, and in the firm belief that such representations and agreements would be fully observed and carried out by the defendant, she did execute and deliver the lease to the defendant, which, as defendant well knew, she would not otherwise have done; and that by reason thereof those verbal representations, statements and agreements became, and are, a part of the entire agreement between the

parties. The plaintiff further alleged that the defendant's acts in applying for, and obtaining, the 640-acre spacing and drilling unit orders from the Corporation Commission were in utter disregard of its agreement with the plaintiff, mentioned above, and constituted a fraud upon the plaintiff, in that the defendant had no intention, when such agreement was made, of performing the same.

In its answer, the defendant specifically denied that its agent in question had any authority to make any agreement with the plaintiff that was not set forth in the lease as revised, or that he verbally represented, or stated, or contracted, or agreed, to or with the plaintiff that the defendant would never drill or participate in the drilling of a well in a unit in excess of 40 acres surface area which included the plaintiff's land, for oil, or in excess of 320 acres surface the drilling of a well in a unit containing any part of the plaintiff's land in excess of 40 acres surface area for oil or in excess of 320 acres surface area for gas. The defendant also denied, specifically, any fraud on its part.

Insofar as unitization is concerned, the plaintiff testified that she read the provisions of the lease form very carefully; that she observed that it provided for maximum spacing of 40 acres for oil and 320 acres for gas, which was interesting to her; that she noted the provisions under which the size of the units could be increased by governmental authorities, which was objectionable to her; that she told Mr. Ross (the defendant's agent involved) that she wanted restrictions to 40 acres for oil and 320 acres for gas and wanted her royalty to be based upon such units, which she did not want increased; that she told him that the only way she would sign a lease would be with her royalty to be computed on the basis of 40-acre spacing for oil and 320-acre spacing for gas; that she was emphatic as to the amount of interest which she wanted and that she would not lease on any other terms; that, after drawing the lines through some of the language in paragraphs 7 and 11 of the lease form, Mr.

Ross said to her: "This will guarantee to you that you will have that amount reserved and it will not be pooled in such a way that you won't have this—your royalty will be computed on the basis of this amount of interest;" that, "He guaranteed me that my royalty would be computed that—that would be computed my royalty unit as 40 acres for oil and 320 acres for gas—that that would be reserved to me." She also testified that, relying upon Mr. Ross's representations and statements, she was willing to sign the lease, and did sign it, and would not have signed it on any other basis except his assurance as to her interest and royalty payments.

On cross-examination, the following questions were asked the plaintiff, and she gave the following answers:

Q. "Now, Mrs. Nisbet, on direct examination you testified this or this in substance, that you told Mr. Ross that you were reserving the interests represented by these spacings. As well as you can now remember was that the statement you made?

A. "Well, it was the income or payment accruing to me that was in my mind on spacing of certain interest.

Q. "I am talking about you said you told Mr. Ross you wanted to reserve the interest represented by the spacing, that's as nearly as you can remember whether you stated it to him?

A. "I don't remember the exact words, but in general what I wanted was interest reserved by 40 acre spacing—40 and 320.

Q. "Now, Mrs. Nisbet, did you tell Mr. Ross 'Now, if there is a 40 acre oil spacing then I want my royalty to be $\frac{1}{8}$, and if it is 80 acres, I want my royalty to be $\frac{1}{4}$, and if it is 120 acres, I want my royalty to be $\frac{3}{8}$, and if it is 160 acre spacing, I want my interest to be $\frac{1}{2}$'?

A. "I did not follow that line of reasoning, no."

No other witness testified upon behalf of the plaintiff. It will be noted that her evidence did not establish, or tend to establish, any of the acts, representations or statements by or upon behalf of the defendant which she alleged, in her petition, constituted fraud in obtaining the execution of the lease by her. However, the trial court sustained her motion to consider her petition as having been amended to conform to the proof.

Mr. Ross, the lease broker who obtained the lease for the defendant, testified upon behalf of the defendant. He not only specifically denied that the plaintiff made the statements to him that she testified she made, and that he made the statements that the plaintiff testified he made to her, and that he made any guaranty to her concerning the basis of her royalty payments in event of pooling or spacing, or concerning the effect of deleting the language that was stricken from paragraphs 7 and 11 of the lease, but also specifically denied telling the plaintiff that the defendant would never drill or participate in the drilling of any well on a unit including any part of her land that would be in excess of 40 acres for oil or in excess of 320 acres for gas. He also testified that while he felt certain that the plaintiff would not have signed the lease if the language that was stricken from paragraphs 7 and 11 had not been stricken, she never made any statement to him that would lead him to believe that she expected her royalty to be in excess of one-eighth in any event whatsoever; that, if she were concerned about her royalty payments in event of pooling or spacing in excess of 40 acres for oil and 320 acres for gas, she did not tell him; and that, except for having the deletions made that were made, and limiting the lease to oil, gas and its liquified products, and sulphur, her main concern seemed to be in the $50.00 per acre cash bonus and the $100.00 per acre production payments until $5,000.00 production payments had been made.

At the request of the plaintiff, the trial court filed its written findings of fact and conclusions of law. The findings of fact included the basic, pertinent facts concerning the plaintiff's undivided five-eighths interest in the minerals and mineral rights in, to and under the tract covered by the lease, the execution and delivery of the lease, the orders made by the Corporation Commission of the State of Oklahoma and the defendant's applications for such orders, and the payment of the bonus, delay rentals, and shut-in royalty, and also contained findings that "No oral representations were made to, or relied upon by the plaintiff to induce her to execute said lease," and "No false representations were made to the plaintiff."

In its written conclusions of law, the trial court concluded that the plaintiff was not defrauded by (into) executing the oil and gas lease and said oil and gas lease is valid; that upon execution thereof, the lease superseded all prior discussions as to the terms and conditions of the lease; that the spacing and drilling unit orders of the Corporation Commission supersede any of the terms and provisions of the oil and gas lease conflicting therewith; that under those orders, the plaintiff's royalty on production from the two sand formations involved in such orders is $\frac{1}{8} \times \frac{50}{640}$, or .0097656, of the market value at the well of all gas produced from those formations in the common source of supply underlying Section 15, Township 6 North, Range 21 East, in Latimer County, Oklahoma, and sold or used off the premises, provided that, when such gas is sold at the well, the market value shall be the amount realized by the lessee from the sale thereof; and her production payment, or overriding royalty, on production from those formations is $\frac{1}{32} \times \frac{50}{640} \times \frac{7}{8}$, or .0021362, of the gas, produced and saved from those formations in the common source of supply underlying that section of land, until the same shall amount to $5,000.00 less production or severance taxes thereon, after which that interest shall, automatically, terminate and revert to the defendant.

The journal entry of the judgment simply reflects a general judgment "for the defendant and against the plaintiff."

The plaintiff presents all of her assignments of error under three propositions:

"Proposition No. 1. The contracting parties—plaintiff and defendant—did not by their acts, as disclosed by the record in this case, impinge upon the undoubted power and authority of the Oklahoma Corporation Commission to prescribe and establish by its order well spacing and drilling units covering any common source of supply of oil or gas, under a state of facts and circumstances where the provisions of Title 52, § 87.1, O.S.A., commonly known as the Well Spacing Act, are applicable.

"Proposition No. 2. The defendant, Midwest Oil Corporation, by its actions through its agents, Mr. John A. Croom of Fort Worth, Texas, and Mr. Ernest B. Ross of Houston, Texas, and especially Mr. Ross, in altering the printed form of the lease, by striking out and deleting certain provisions thereof, and by his verbal representations and statements to plaintiff, as an inducement to her to execute the lease involved here, which representations she relied upon in executing said lease, all as shown by the above statement of facts, is now estopped to deny that it is obligated to pay plaintiff royalties due her under the terms of said lease, as altered by said Ross and in accordance with his representations and statements, as aforesaid.

"Proposition No. 3. Where an instrument is attacked for fraud, all of the facts and circumstances leading up to and surrounding the execution of the instrument, as well as the motives and intentions that prompted the maker to execute it, may be shown by parol."

This third proposition involves the primary relief sought by the plaintiff, namely, recission of a written instrument on the ground of fraud in obtaining execution of such instrument by the maker thereof, and we shall consider it first.

An action to rescind or cancel an instrument of conveyance is one of equitable cognizance. Hackett et al. v. Hackett et al. (1967), Okl., 429 P.2d 753; Ionic Petroleum, Limited v. Third Finance Corporation et al. (1966), Okl., 411 P.2d 492.

In an action of equitable cognizance, this court will examine the whole record and weigh the evidence and affirm the judgment of the trial court unless clearly against the weight of the evidence or contrary to law or established principles of equity. Murdock v. Loeffelholz (1966), Okl., 421 P.2d 236. And, where a particular fact is required to be established by proof of a certain degree or character, the two rules must be taken and considered together, and in such cases, this court will weigh the evidence and determine whether or not the proof conforms to the required standard. Hurst et al. v. Stowers et al. (1965), Okl., 399 P.2d 477, 480.

In this jurisdiction, where fraud is alleged in the procuring of a written instrument, the proof must sustain the allegations by a preponderance of the evidence so great as to overcome all opposing evidence and repel all opposing presumptions of good faith. Hembree v. Douglas et al. (1934), 169 Okl. 403, 37 P.2d 314. In such a case, the proof of the alleged fraud must be clear, cogent, convincing, positive and satisfactory. Brotherhood of Railroad Trainmen v. Brown (1937), 180 Okl. 489, 71 P.2d 742, 743.

As the facts constituting fraud in the present case, the plaintiff alleged in her petition that she executed and delivered the lease in question in reliance upon the defendant's agent's false representation and agreement that the defendant would never drill or participate in the drilling of a well on a unit which included any part of the plaintiff's tract and contained in excess of 40 acres in surface area, if for oil, or in excess of 320 acres in surface area, if for gas, and that, in utter disregard of such representation and agreement, the defendant applied for and obtained from the Corporation Commission of the State of

Oklahoma orders establishing 640-acre spacing and drilling units with respect to two gas formations underlying her land and thereafter drilled a well, on the drilling unit that included her land, which produced gas from both of those formations. However, although the evidence disclosed the defendant's applications for such orders, and the granting of such orders, the drilling of the well in question, and the production of gas from both of the formations covered by such orders, she not only failed to introduce any evidence to show that the defendant did not intend, at the time the alleged representation and agreement were made, to comply therewith (Rogers et al. v. Harris, 76 Okl. 215, 184 P. 459; Sooner Bond Co. of America v. Davis, 177 Okl. 143, 58 P.2d 300), but made no attempt to prove that the defendant's agent made any such representation or agreement, and he testified that he made no such representation or agreement.

Therefore, insofar as fraud in procuring the lease is concerned, the plaintiff must rely upon her own testimony to the effect that the defendant's agent told her that deleting the language that was stricken from paragraphs 7 and 11 of the lease form would guarantee that she would receive royalty on the basis of units not exceeding 40 acres in surface area for oil and not exceeding 320 acres in surface area for gas, and that he guaranteed that her royalty would be computed on that basis, and upon the amendment of her petition to conform to that testimony. The defendant's agent in question specifically denied making any such statements to the plaintiff.

Particularly in view of the above mentioned rules concerning proof of alleged fraud in procuring a written instrument, the trial court's finding of fact, and conclusion of law, that there was no fraud on the part of the defendant, and the judgment, insofar as based upon such finding of fact and conclusion of law, are not clearly against the weight of the evidence, and the judgment is not contrary to law or to any established principle of equity that

has been called to our attention or of which we are aware. The plaintiff's third proposition must be denied.

Plaintiff's first and second propositions are concerned with the prayer of her petition that, in the event the court does not decree recission of the oil and gas lease for fraud in procuring it from her, and provide for an accounting as though the lease never existed, she be decreed to be entitled, under the lease, as affected by the deletions of language from paragraphs 7 and 11 of the lease form and as altered by statements allegedly made to her by the defendant's agent immediately prior to her execution of the lease, to receive royalties on all gas produced from the well involved in this action, at the rates provided for in the lease but on the basis of a 320-acre pooling unit.

Both parties rely upon the validity of the two above mentioned spacing and drilling unit orders made by the Corporation Commission, and in effect at least, recognize that the right of the Legislature to act under the police power of the state is a part of the existing law at the time of the execution of every contract and, as such, becomes in contemplation of law a part of the contract (State ex rel. Roth v. Waterfield (1934), 167 Okl. 209, 29 P.2d 24; Layton et al. v. Pan American Petroleum Corporation et al. (1963), Okl., 383 P.2d 624); that a statute such as the 1947 statute that appeared as 52 O.S.1951, § 87.1 and, as amended in 1955, appeared as 52 O.S.1961, § 87.1 (which was in effect when the oil and gas lease involved herein was executed and when the Corporation Commission made the two spacing and drilling unit orders involved herein) is a proper exercise of the police power (Anderson v. Corporation Commission et al. (1957), Okl., 327 P.2d 699; Layton et al. v. Pan American Petroleum Corporation et al., supra), and being in effect at the time this oil and gas lease was executed, were by operation of law incorporated in the lease (Layton et al. v. Pan American Petroleum Corporation et al., supra), at least to the extent that a *valid* provision of the lease

does not provide otherwise. Both parties agree that, under the case of Rabon et al. v. Berry et al. (1952), 206 Okl. 523, 245 P.2d 440, the parties to an oil and gas lease can legally contract in such a way that the lessee is bound thereunder to pay royalties to the lessor on a basis that is different from the generally applicable basis provided therefor in an order of the Corporation Commission which establishes spacing and drilling units affecting the leased land, without impinging upon the authority of the commission to make orders establishing spacing and drilling units and providing a generally applicable basis for the apportionment of the production from wells on such units.

 The defendant, of course, denies the plaintiff's contention that, insofar as royalties to be paid under this lease are concerned, they contracted against oil units in excess of 40 acres in surface area and against gas units in excess of 320 acres of surface area, whether established by the lessee or by a governmental authority having jurisdiction to do so. The plaintiff relies upon the guaranties which she testified the defendant's agent made to her immediately prior to her execution of the lease agreement, as becoming a part of the contract, as well as upon the effect of the marking out of the particular language that was deleted from paragraphs 7 and 11 of the lease form.

Regarding paragraph 7 of the lease form, we are of the opinion it does not, in any manner affect the lessor's royalties under the uncancelled lease.

Paragraph 11 of the lease form, with the deletions, does not contain any provision whatsoever concerning royalties, or any other matter, in the event the leased land, or any portion thereof, be included in a drilling or spacing unit established by order of any governmental authority having jurisdiction to do so. Of itself, the lease form, as revised by the parties, does not bind the lessee to pay royalties to this lessor on a basis that is different from the generally applicable basis provided therefor

in the Corporation Commission orders involved herein. Therefore, unless these parties have, in some other manner, validly agreed to the contrary, those orders of the Corporation Commission concerning the allocation of production from the units established thereby, are a part of this lease and the parties are bound thereby.

In this latter connection, although the plaintiff did not expressly pray that the lease contract, as revised and signed, be reformed, that is the effect of her argument. She argues, in substance and effect, that the evidence concerning the conversations between her and the lessee's agent prior to the revision of the lease form and her signing the lease as revised disclose that it was the intention of the parties, in deleting the particular language that was deleted from the lease form, to provide for, and *to guarantee,* Royalties to her on the basis of units not exceeding 40 surface acres for oil and not exceeding 320 surface acres for gas, *in spite of* any orders of any governmental agency having jurisdiction to provide for larger units, and that, therefore, insofar as her royalties are concerned, this lessee is estopped from relying upon the Corporation Commission orders involved herein, especially since they were made upon application therefor by this lessee.

Assuming, without deciding, that evidence concerning the oral negotiations which preceded or accompanied the signing of the lease would be admissible, in the absence of fraud, to explain the written lease, and upon full and careful consideration of such evidence, we hold that the judgment of the trial court, insofar as it refuses to treat the lease as being reformed to conform to the plaintiff's theory concerning the intention of the parties in deleting the language that was deleted from the lease form is not clearly against the weight of the evidence.

Judgment affirmed.

JACKSON, C. J., IRWIN, V. C. J., and DAVISON, WILLIAMS, BERRY, HODGES and McINERNEY, JJ., concur.

BLACKBIRD, J., dissents.